We'll hear argument in Roberts versus Gestamp West Virginia, LLC. Thank you, Your Honor. My name is Richard Walters. I'm here today with Ryan Walters for the law firm of Schaefer & Schaefer in Charleston, West Virginia. We are here today on behalf of the appellant, Kasey Roberts, appealing the district court's order granting summary judgment to the defendant's appellees in this matter. The district court's decision multiple errors in it, not only citing the wrong law, but most importantly, ignoring a plethora of disputed facts in this matter. The circuit court's decision properly cited the proper standard. And on page two of the decision stated, when determining whether summary judgment is appropriate, a court must view all the factual evidence and any reasonable inferences to be drawn therefrom in the light most favorable to the non-moving party. It's our position that the court turn the standards on its head and actually look at the facts in favor of the moving party when making this decision. This court, as late as last year, in Cedar versus Reston, Town Center, 988-Fed3-756, discussed the standard and stated that a plaintiff need only provide, quote, beyond speculation that provides a sufficient basis for a reasonable inference of causation. In the case of ours, our position that we met that standard by far. And in fact, what this case is really all about is the notice that Mr. Roberts provided to the appellees for his need for medical leave. And if you look at the standard of the facts in favor of the non-moving party, it's clear that Mr. Roberts did properly provide that notice. What we're looking at is, really, did Mr. Roberts provide the notice of his need for medical leave as required by the Family and Medical Leave Act? And the answer to that question is emphatically yes. Not only did he provide the employer with the proper notice he needed to under the Family and Medical Leave Act, he also did so in compliance with their own policies. There's kind of a preliminary question, isn't there? Did he provide any notice that he was going to be absent at all for any reason as required by his employer's policy before you even get to the FMLA question? Right. And the way we're looking at this, the notice he was required to provide is under the FMLA and under their policies. And under the FMLA and under their policies, this is an unforeseeable event. He did not know he was going back into the hospital. He did not know he had a reoccurrence of the infection. So, with an unforeseeable event, what you're required to do is provide notice as soon as possible. And Mr. Roberts did that, and he did it emphatically. He did it on the Friday before, telling them he was going back to the hospital. He did it on the Monday that he was off work, telling them that he was in the hospital. So, as far as that initial standard, he did tell them. But I guess the employer's response is, but he didn't provide notice for the days that he was absent, right? So, the 21st, et cetera, et cetera. So, all the days after that. That was after he was already in the hospital, after he had already provided them notice that he was in the hospital. So, what did he say that gave them notice he was going to be out on the 21st? On the 21st. Actually, it was on the 20th. On the 20th, he sent the message to his supervisor saying, hey, I'm back in the office. I'm sorry. I'm back in the hospital. The infection has under the employer's policies and specifically under 29 CFR 303C of the Family Medical Leave Act. Once the employee provides the employer with adequate knowledge that it may be a qualifying event, it's the employer's obligation to then reach out to the employee if they need any additional information. And both the HR manager and the supervisor for the defendants testified that the manner in which Mr. Roberts provided notice of his need for leave was adequate under their policies. He had done the exact same thing. Is that under the CFR, is that the employer has to reach out if they need any further information to determine whether it is covered leave? That's how I read it, but I'm not entirely sure. Yes. That if they need more information to determine, is this leave going to be covered by FMLA? Correct. Under 303B, it states the employee must specifically reference either the reason for leave or that he's in the, has been hospitalized overnight. The employer will then be expected to obtain additional information through even through informal means. So once they've been notified that he's in the hospital, if they have any additional questions beyond that, then it's their obligation to reach out to the employee even through informal means to find any additional information they need to make that determination. But it doesn't switch the burden under, you know, an employer's policy that it's the employee's responsibility to call in and say, hey, I'm going to be out today, or, hey, I couldn't call you yesterday, but I was out yesterday and today because I'm in the hospital with that thing we talked about earlier, right? It doesn't become the employer's obligation to call every day and say, where are you? Are you in the hospital? Are you on vacation? Have you taken a sick day? Not once. No, Your Honor. And that's why when you look at what the usual customary procedure was, we have, our courts, well, a couple of courts have discussed what that usual customary procedure is, how those policies work. And in IJAMES, which is unfortunately not in the materials, the District Court of North Carolina in 2009, Lexus 6185, testified, held that even when there are written policies, if the employer, if the plaintiff can show that the usual customary manner by which they have this communication with the employee is some manner other than the written policies, then summary judgment's not appropriate. Yeah, and I'll let you move on to that. I guess my, I have kind of a preliminary hang-up that I don't even know we get to usual and customary because there was no notice. It's not, it's not, well, is Facebook okay? Is calling okay? But I don't see any notice in the record that he's going to be out on these particular days. Following his hospitalization after the 20th. Right. And that's when, and that's when that burden does shift, Your Honor. Under the FMLA, under those regs, once he notifies them, like he did back in July 27th, and says, hey, I'm in the hospital, they reached out to him. And then they had that communication. It's a two-way street. They had that communication. Mr. Walters, can I ask you about that? So, but one of your arguments is that, let's assume for the moment I'm sorry, Judge Rushing's point is well taken. One of your arguments is it not, is that Mr. Roberts was in fact fired on the 21st. And so, at that point, the notice becomes academic. It does. And one of the disputed facts that we point to in our rebuttal brief, is our reply brief, is that. Or at least there's a dispute about that. There's a dispute about it, absolutely. The employer takes the position that no, we didn't fire him until the 28th. We made the decision to fire him, affected the 21st. And they point to a document that has a date on it. It's our position that when he didn't, when on the 21st, and this is the key, on the 21st, when HR, Mr. Slater, Robert's supervisor contacted HR and says, Mr. Roberts hasn't checked in. He didn't tell HR that on Friday, he told me he was going to the hospital. He didn't tell HR on Monday, he told me that he wasn't, he still was in severe pain. He didn't tell HR that on Tuesday, he told me he's in the hospital for the infection again, and doesn't know how long he's going to be out. None of that information was provided to HR. So, when HR made that decision, they did it on the 21st. They didn't even get the two-day required notice under the FMLA. And that decision was made at that point in time. So, it doesn't matter if Mr. Roberts had checked in on the 23rd. What was your evidence? I know you dispute the date, and I think, but correct me if I'm wrong, it all comes from one document, right? You read that document and say, look, it says 21st, and then the employer reads the document and says, it has another date on it. There's no conflicting testimony, is there? Yes, it's just a document that can be, our argument is, it clearly says on that document, his termination is the 21st. That represented unemployment. His termination was the 21st. And a witness testified and explained why those two dates were on there. They claimed that because the date on the 28th is when they put that in, and therefore, we're supposed to infer from that, that that decision was made on the 28th. It wasn't just entered on the 28th. And again, our position is, that's not sufficient evidence on that. But even if you go to your- What's the contradictory evidence? It's just the document itself, Your Honor. And the representations they made that his last date was the 21st, and they acknowledged that his termination was effective, the 21st. So the question becomes, when did they make it effective? But it's clearly the 21st. Have you preserved an argument? Because let me just, what I'm finding most difficult about this case is, if I think they couldn't have fired him on the 21st, or if I think there's a genuine dispute of material fact about whether they could have fired him on the 21st, but I don't think there's a genuine dispute of material fact they could have fired him on the 23rd, which is a point at which he's no longer, he says, I'm going into the hospital, don't know how long I'll be here. But then he's discharged from the hospital, and is at home for a week, and says nothing to his employer. I think they could have fired him on the 23rd. Have you preserved a claim that it was wrong to fire him on the 21st, that they could have fired him on the 23rd? Absolutely, Your Honor. Where? And the reason being is, under the argument that the 27th, June 27th, when the same situation happened, and August 20th are the exact same scenario. The HR director- No, I guess I'll say, where have you preserved an argument that- Your fundamental argument is that where can I see that you've made the alternative argument that there was a two-day period when they couldn't have fired him? We didn't rely upon the two-day period, Your Honor. What we have relied upon was 303B, where the FMLA says once the employee provides them with adequate notice, if the employee needs any additional information, they're required to reach out to the employee. It is a burden shifting. They are required to reach out, even through informal- Okay, but assume I think that's wrong. Assume I think they can fire him on the 23rd. Do you have a claim that they were wrong to the 21st to the 23rd, but he could have absolutely been lawfully fired on the 23rd? Not if you take the position, not if Your Honor takes the position that the notice was inadequate. If the notice was inadequate and the employer was not required to reach out at that point in time, then no, there would be no preservation of that claim, because at that point in time, we would not prevail. So what is your authority? I mean, I understand there's a question of who has to give notice to who, but I mean, just taking a step back and trying to think about how this scheme is supposed to work, you know, I suppose maybe it makes sense for him to say, I'm going into the hospital, not sure how long I'm going to be here. And maybe it's reasonable to say the employee then doesn't have to provide daily updates because it's covered by his previous statement. I'm in the hospital until I tell you I'm not in the hospital. We'll let you know when I'm not. But in what world does it make sense to say that the employee can then be discharged from the hospital, stay home for an entire week and not tell his employer at any time during that week? Walk me through how that makes sense as a matter of what this statute is designed to do. The reason, Your Honor, is that's not what the decision was. The decision was we're not firing because we didn't hear from him since 28. The reason was we never heard from him. We've never heard from him. He didn't tell us he's in the hospital. He didn't give us any notice whatsoever. What if they had said that? What if they fired him on the 23rd and said, what are you talking about? The day he came in for the first time a week later and they said, where were you last week? And he said he was at home. And in your view, could they have done that? No, no, I do not, Your Honor. And the reason being is because all they know, the only information the employer has is on August 20th. After being in the hospital for two and a half months, he's back in the hospital. In the last three months, he's only worked four days because he's been in the hospital or been under medical care. So he comes back to work for four days, goes out on the fifth day. All they know is he's back in the hospital. Well, they assume he's back in the hospital, but it turns out he wasn't in the hospital. That was not true. Absolutely. Once he tells them that he's in the hospital on the 20th, on August 20th, he's back in the hospital for the infection, then yes, the burden does shift to the employer to say what's going on here. And it's not an onerous burden under the circumstances. And you can't look at this in a vacuum. Why does the burden shift? I mean, he said it's about the appendicitis. We should assume that was already covered by FMLA. The employer knows that's a covered leave. So there's not even really, doesn't seem like a dispute about whether if they knew he was in the hospital for an appendicitis, a continuation of that infection, that this would be covered. The question is, does saying, don't know how long I'll be here, does that mean an hour, two hours, three hours a day, four days a month? And does the employer then have to call him until they figure that out? Or once they determine this is FMLA leave, they know it's going to be absent. That's what 303, 29 CFR 825-303b talks about, is once he hits that threshold, once he gives them enough information to notify them that the reason he's not at work is an FMLA qualifying reason, that burden does shift to the employer to say, well, what's going on? How long are you going to be out? The burden shifts for them to determine whether or not it's FMLA leave, because we don't expect employees to know what FMLA leave is, to know their rights. So the burden shifts to the employer to determine whether it's covered leave. But here, there doesn't seem to be a problem with that. They know from the moment he says it's an appendicitis infection that this relates back to the previously covered leave. So there's no, it's not as though then all the employment policies that he's signed on to, the burden shifts under them. And yes, it becomes the employer's duty to call and determine whether he's going to be out that day. If you go beyond simply identifying as FMLA leave, it's the employer's policies about providing notification within 15 days. He has 15 days from the time that he notifies them of the need for the FMLA to provide the medical certification. If they need that, all they got to say is, look, you got 15 days to get us something from your doctor. We need to know when you're going to come back as soon as you know. There's got to be something. They want to claim that Mr. Roberts went silent and didn't tell him anything. The employer went silent and didn't communicate anything. This has been a process that's been going on for three months. And suddenly the employer wants to ignore all that. And when you look at the totality of the circumstances, it's not appropriate in this circumstance for the employer to say, okay, we know he's on FMLA, but if we don't hear from him, let's go ahead and fire him. At that point in time, they do have that obligation to say, okay, let us know when you're going to be able to come back. Here's your certification. You need to fill out the certification. You've got to tell him something. They've got to say, okay, you've got to get that certification back to us within the 15 days. None of that occurred. And the fact that not only didn't occur, the supervisor lied about the reason why he wasn't there and testified that he didn't even know. So it does go back to that notice requirement. And once that notice requirement is hit, then yes, the burden does shift to the employer. If you're going to fire him, you better reach out and say, what's going on first? Because you know he's off for an FMLA reason. So you read the notice requirement as not limited to the simple question of whether or not he's entitled to FMLA leave, but how long he's going to be on that leave? Any questions the employer has related to that leave, once it is qualified as FMLA, once they know that, once they have enough information to determine it's FMLA, any additional information has to be a two-way street. He told them, I'm out. I'm out indefinitely. They want to know more information. They have the right to gather as much information as they want. They've got to ask. They can't just pretend like, well, he's out, we know he's out, we're not going to worry about it. Should Mr. Roberts have contacted them before the third? Absolutely, he should have. Was he required illegally to do so with no contact from the employer? No, he wasn't. The employer had to reach out. He's got 15 days to provide certification from his doctor. They didn't even ask for it. They just fired him. And it all goes back to their argument, which is not supported by the factual scenario here, that they didn't know the notice. Because they absolutely did know about the notice, and that's the issue of fact that was misinterpreted below. All right, Mr. Walters, you've got some time left for rebuttal. Thank you very much. Thank you, Your Honor. Mr. Ramey? Is it Ramey or Ramey, sir? It's Ramey. May it please the Court, Travis Ramey for Gaston. Your Honor, the FMLA seeks to balance the interests of employers and employees, and to help achieve that balance, it imposes some requirements on employers' usual and customary notice procedures when requesting leave. They have to provide sufficient information to the employer to make a determination whether leave is FMLA qualifying, and they have to cooperate with employer efforts to obtain additional information. Here, Mr. Roberts failed to satisfy those obligations, so he was not entitled to FMLA leave. To begin, Roberts undisputedly did not comply with Gaston's written procedures for requesting leave. Those procedures required him to call a call-in line at least 30 minutes before his shift began. But you agree the regulation does not say you have to follow your employer's written policy. It says you have to follow your employer's usual and customary policy, right? Absolutely. I agree that that's what the regulations say, Your Honor. And so really the question here is, what is the written policy, the usual and customary notice procedure? And would you agree that when the district court said that is a question of law, that that was clearly wrong? How could that possibly be a question of law with the usual and customary policies? Well, Your Honor, if the facts underlying are undisputed, then it would be a question of law. In here, the only evidence in the record of any modification of the written procedure into some alternative usual and customary procedure is two instances where there were Facebook messages exchanged about leave, only one of which gave any notice about absence. And that sending of a Facebook message to Gary Slater by Roberts wasn't really a variation from Gaston's written policy. Because under Gaston's written policy, a person normally must provide personal notice through the hotline. However, the policy states that in an emergency, the employee can have a third party provide that notice. In other words, Mr. Roberts could let Slater know that he was going to be out, and Slater could then not notify Gaston that he would be out. And that's consistent with policy. Mr. Reamy, can I ask you about the Facebook messages? Because you seem to indicate that there was a very limited exchange between Mr. Roberts and his supervisor. But that's not Roberts and Mr. Slater. So why isn't that a sufficient deviation from the typical practice that would make it at least a factual question as to whether or not it was usual and customary? Well, I think there are two answers to that question, Judge Diaz. And that's, first, what's relevant here are communications that provide notice of absence, not just communications in general. So really, the only two that are arguably communications about notice of absence other than the ones that are directly relevant to this case, to this mid-August to September period in which Mr. Roberts was out, are a June 14th communication that began from, actually was initiated by Gary Slater, in which he said, what's the word? And then Mr. Roberts replied that he had an infection on his staff, and they had him out because he was on antibiotics. That communication unambiguously shows that there had been some previous communication about a health issue. The only other one is the emergency communication on the morning of the 27th in which Mr. Roberts informed him that he was apparently on a gurney on the way back to surgery. Well, I know you want to skip over that first one, but that first one strikes me as really bad for you because it's an instance in which this gentleman's supervisor is himself choosing to initiate a conversation about his health status over Facebook Messenger, and then your client wants to turn around and argue that it's inappropriate for him to notify his supervisor using the previous method that his own supervisor had used to initiate. Why isn't that really, really bad? Because, Your Honor, I think what's relevant here is communications from Roberts to Gestamp notifying Gestamp that he will not be at work. I mean, you could slice it that way, and maybe a fact finder would find it that way. I mean, but another way to think about it is employees take their cues from supervisors, and when supervisors convey through their conduct that we're going to talk about your health situation via Facebook Messenger, maybe a reasonable employee concludes, this is how my employer or my supervisor wants to talk about health information. Your Honor, assuming that's true, we still have the problem of, let's assume we do have a modification of the policy, the written policy, to some other usual and customary policy, well, then we have to know what the policy is. And if we're using the appendectomy leave as our sort of acne example of that, then what did Mr. Roberts do there? He didn't just send a Facebook message on the 26th that said, I'm going into the hospital to have surgery. I'll be back at work at some indefinite time in the future. What we see is he comes out of surgery, and the day of his surgery, he hasn't given me a doctor's note. And the very next day, he brings the doctor's note to Gaston. Mr. Roberts, in his briefing, paints this as the notice was purely this Facebook message, but the previous example in the appendectomy shows that the notification and the information he supplied to Gaston was a lot more than just a one-off Facebook message saying, I won't be at about how long he would be out. And that's consistent with the general rule that employers are entitled to notification of the anticipated duration of any FMLA leave. That's necessary, necessarily a part of their decision to determine whether leave is FMLA qualified. With that, the fact that he sort of engaged in that exchange the first time around, does that mean he did it the second time around when, in the face of a regulation that appears to impose an obligation on the employer once notified of the hospitalization to inquire further? Your Honor, what I think it shows is that if there was, if the written policy is not the actual policy, if there's some unwritten policy of how to provide appropriate notice and what that notice must contain, that Mr. Roberts understood that it required more of him than to just send a one-off Facebook message saying, I'll be out of work for some unknown and indefinite period of time. So if we're using his prior conduct and Gaston's prior conduct to show a modification of the policy, I think it's directly relevant to look at what he did before and to see the vast disparity in the amount of information he provided to Gaston when he was out for his appendectomy and the dearth of information he provided in mid-August. Additionally, this duty to follow up and inquire is not the only duty that's at play here. If you look at sections like 825-303-A, it implies an employee's duty to follow up with additional information when an emergency abates. You have 302-B's obligation to, when you have leave, where the timing and duration of it is unknown. Once the employee knows the timing and duration of that leave, he has an obligation to inform the Mr. Roberts had that information when he was discharged from the hospital on August 23rd. What we see is that the duty to inquire that Gaston may have under the regulations is not the only duty. Before you jump to the 23rd, can you talk about the question about whether there is in fact a genuine issue of disputed fact as to when he was terminated? Your Honor, I don't believe there is an issue of fact. The documentation, it's on J-565, shows it unambiguously lists his termination date as August 28th, 2019. It actually states that twice on the document, if I'm correct. There is a notation for August 21st that states terminated for job abandonment. In his deposition, Scott Hughes explained why that note was there on the 21st. He said that they had made his termination retroactive to the 21st because the 20th was the last day before which they knew where Mr. Roberts was. He was on vacation that day. But the termination was made retroactive purely for their payroll purposes, and that's why the notation is there on the 21st. But he repeatedly stated unambiguously, I made the decision to terminate him on August 28th. So what do I do if I think that was illegal then? So you said they did it for payroll purposes, which is another way to say they didn't pay him. Again, the question I ask your friend on the other side, what if I think they could have terminated him on the 23rd, but that I think there's at least a genuine issue of material fact about whether you could have terminated him before that? Well, Your Honor, I think the issue is they did not terminate him until the 28th. So I don't think there is- Well, I mean, I agree. I guess you're saying they didn't actually do it, but if they did it retroactive to that date, I mean, doing something retroactive to a date is kind of doing it to that date, right? That's the reason you do something, make something retroactive. Your Honor, I guess- I'll concede, Your Honor, that I hadn't thought of this. And so I don't have a well-reasoned, well-thought-out response to your question. But I guess if the court concludes that it was illegal to terminate him on the 21st, and there is an issue of fact as to whether he was terminated on the 21st, but they could have FMLA interference claim for two days. He was on unpaid leave, so I don't really know what his damages would have been. Can I ask you a question about that? This question seems to presume that the employer's policy is that if you're a no-call, no-show for three days, then the employer can terminate you, but you get paid for three days of not showing up. You get paid for two or three days of no-call, no-show. Is that the employer's policy? No, Your Honor. He would have to have had- He would have to have taken paid leave for that time. Those no-call, no-shows, those are- If you're terminated for that, that's retroactive. You don't get paid for those days that you didn't show up. That's correct, Your Honor, because you wouldn't have me taking ETO or vacation time for those days. These are hourly employees. If they don't show up and work, he doesn't get paid. That's why I say, in response to your question, that perhaps there is an- Academically, there may be a claim for those two days, but I have no clue what Mr. Roberts' damages might be for those two days. Really, this case, in my opinion, is fairly analogous to the Seventh Circuit's decision in the Lewis v. Holzman v. Fort Wade case, which cited in the briefs. In that case, you had an employee who had an asthma attack and was out on FMLA leave for four days and then took a seven-day vacation and never informed the employer when she would return to work. So, after the seven-day vacation ended, in three consecutive days, she no call, no show to work, and the employer therefore terminated her employment. She returned with medical information that she was under doctor's care for those days, and the Seventh Circuit said that termination did not violate the FMLA because she had had an obligation not to keep her employer in the dark and to inform the employer of when her expected return was. The FMLA may provide protections, but it doesn't extend to silence from the employee in the face of information that the employer needs to determine the duration and qualification for FMLA leave. That seems to be directly analogous to the situation here. I understand Seventh Circuit decisions aren't controlling here, obviously, but it is analogous reason. But even if we get past all of that and we do get to Gestamp's duty to inquire, to make inquiries for additional information, let's assume for the sake of argument that the written policy that Mr. Roberts definitely violated is not the usual and customary policy. Let's assume that the usual and customary policy requires only the initial Facebook message saying, I'm in the hospital, my pain is back, they think an infection has returned, I don't know when I'll come back. Let's assume that that's sufficient and complies with the usual and customary policy. Gestamp did attempt to engage with Mr. Roberts in at least two ways. The first is the calls that I understand that Mr. Roberts' position is that for the purposes of summary judgment, those calls didn't happen. But to do that, I think he overreads some testimony from Scott Hughes in his deposition about whether there would be a notation of those calls in Gestamp's AOD attendance system. He reads Mr. Hughes' deposition testimony to say, if those calls had been made, there would be a note. That's not what Mr. Hughes said. What he said was, in response to a question of whether there would be documentation of the calls, he said, there may be a note in the AOD system. He was asked if that was typical, and he said, it's very possible to do that. Is that something they're supposed to do? And he said, yes, they do. I don't see that as saying that if the calls were made, there would be a notation. And so I don't think that a reasonable fact finder could conclude from that in the face of all the unequivocal testimony that the calls were instructed to be made, were made, and that Dornsife responded back to Scott Hughes that the calls were made and they could not reach Mr. Roberts. I don't think there's an issue of fact as to whether those calls were made. There's some dispute about where the calls were made. They were made to his home number, not his cell phone. That's correct, Your Honor. They were made to his home number, which did not have voicemail. But that number was the number that Mr. Roberts provided to Scott for contacting him. Just to go back to the usual and customary way of communication, if you're conceding that there's a deviation from that, why wasn't Facebook the manner in which to follow up with him? What Hughes' testimony was that that's not how HR operated. They called the number that was provided to him. So at least, insofar as it's contacts from human resources, that was their usual and customary method of contacting employees, was to call them at the home. Well, I guess there's a question about whether or not HR actually knew where he was. There's some dispute about whether Slater actually told HR back then. But if they did know, then what sense would it have made to call him at home if he was still in the hospital? Well, Your Honor, there's a couple of answers to that question. One, I don't think it is disputed that HR was entirely ignorant of the current situation regarding Mr. Roberts having been whether he told HR or not. And Scott Hughes' unequivocal testimony was, we had no clue. I didn't find out about any Facebook messages at all until during the litigation. So I think the undisputed record is that human resources did not know at all that Mr. Roberts wouldn't be at home. And again, they contacted him at the place where he had put the number they'd been told to use to contact him. And there was no voicemail. There was no ability to leave a message. And he didn't respond. So that's the first time at which we have Gestalt Human Resources reach out to inquire as to where he is and what's going on. If he had replied to those calls when he returned home on the 23rd, of course, they now know where he is and they know what's going on. If he had brought by the notes on the 23rd when he got out of the hospital the same way he had done when he was out with his appendectomy, of course, now Gestalt Human Resources knows where they are and they can inquire and get additional information from him. But as an absolute backstop, we have one undisputed instance in which Gestalt attempted to engage with Mr. Roberts to obtain additional information and he refused to cooperate. And that's when he returned to work on September 3rd. When he returned to work on September 3rd, he could not clock in, so he reported to Gestalt Human Resources. Stevie Shamblin in the Human Resources office informed Mr. Roberts that he was not in the system and had been terminated. He then provided his medical excuse. And at that response, Gestalt Human Resources said, okay, let's get your supervisor in here. Let's get this worked out. Let's get it figured out. Let's sort this out. Now, at that point, under, I believe it's, let's see, the regulations would have allowed Gestalt to retroactively determine that it's, I'm sorry, it's 825-301-D. Gestalt could have retroactively decided that Mr. Roberts' time away had been FMLA qualifyingly. The regs allow for that, assuming that there's no prejudice to Mr. Roberts. But what is Mr. Roberts' response? And I don't see how that could have possibly been prejudicial to Mr. Roberts. It might have saved his job. But Mr. Roberts' response was not to engage with Gestalt and to deal with the inquiry. His response was to twice refuse to meet with the supervisor and tell Stevie Shamblin, no, thank you. I will just go clean out my locker and leave. At which point, Gestalt concluded that Mr. Roberts didn't want to be reinstated. He didn't want to come back. And so they just let him go. Well, because Mr. Roberts refused to cooperate with that inquiry at which Gestalt could have retroactively designated his time away as FMLA-eligible, he violated his obligation to cooperate with an inquiry by Gestalt to determine whether he was FMLA-eligible. And that is enough alone to disqualify him from FMLA leave under the regulations. Even after he'd been terminated? Yes. Do you have a case that stands for that proposition that the employee has an ongoing obligation to engage even after he's been terminated? No, Your Honor, but it makes sense in the general scheme of things, given that the employer can retroactively designate leave as FMLA leave. One of the only couple sensible reasons for an employer to do that would be to fix a mistake in which leave had not been designated as FMLA leave, but it later turned out the employer discovered that it was FMLA-qualified. It makes sense at that point to require the employee in spirit of balancing interests and cooperation that the FMLA embodies in this relation between employers and employees to require him to sit down and have a five or ten minute meeting in which he explains the situation and they see if they can sort it out. Now, we don't know what would have happened in that meeting. We can never know. And we can never know because Mr. Roberts refused to engage with Gestalt and respond to their inquiry of trying to sort out what was going on. Um, Your Honor, I see my time has expired. Uh, unless there are further questions, I urge the court to affirm. Thank you, Mr. Ramey. Mr. Walters, you have some time for rebuttal. Thank you, Your Honor. The first thing I'd like to address is if we can go back to Judge Brushing's question about that interactive process and what obligation does the employer have once they learn that the employee is off on FMLA leave. This court has already addressed that issue in People vs. Coastal Office. It's in the pleadings in this matter. And in that case, the court found that once they are notified, the FMLA designation, the requirement of FMLA is to balance the demands of workplace and needs of the family and encourages employees and employers to communicate with each other in an interactive process that helps each party fulfill the needs. And in People's, the employer actually went above and beyond and was kept in the dark. The employee was very evasive and didn't provide the necessary information. And therefore, this court held that, you know, the employee did what they're required to. They tried to find out what's going on. And they met with a stonewall, in fact, with lies about why the employee was off. And that's why he wasn't qualified. But the point being is the court held and the argument was you have to have that interactive process. You can't just pretend that you don't know your employees in the hospital, especially coming off of two and a half months in the hospital. You can't just pretend that happened and move on and hope that you have an opportunity to terminate them six days down the road. And I'm not sure, I apologize. I don't remember if it was Judge Rushing or one of the other honors that asked a question about whether or not there's any evidence out there that supports our position that termination happened on the 21st, other than that one screenshot that shows 21st and 28th. And I apologize, I forgot. Yes, there is. Emphatically, there is. Joint Appendix Number 37 is the stamps checklist. And on their checklist, the date is 8-21-19. So the very first document, one of the very first documents we received in discovering this matter showed his termination list date as 8-21. It wasn't until we got further into discovery that they came up with a screenshot to say, oh, this explains that away. But their initial list, what their representations from day one were is he was terminated. The other issue I'd like to address is, and when you talk about whether or not there's usual customary circumstances or if there's reasons why which you can avoid or go around the written policy, you need look no further than the stamps declarations that they submitted to the declaration on behalf of Mr. Slater himself. Mr. Slater says in his declaration, June 27th, 2018, Mr. Roberts sent a Facebook message to me more than 30 minutes before their shift stating, hey, I won't make it into work today. I'm at the hospital. They're sending me for surgery. Because Mr. Roberts was hospitalized and in an emergency situation on June 27th, I did not consider him to have violated the attendance policy requiring him to call in the hotline to report any absences. Scott Hughes, HR manager, testified likewise in his deposition and clearly stated that in an emergency situation, which is the second way in which you can provide notice, that not calling the hotline was permissible and using Facebook Messenger was permissible. Your Honor, you pointed out that the statement by the appellants that they had one or two conversations is a gross misunderstatement of the facts in this case. Over the two and a half months up to Mr. Roberts' termination, there were over 50 Facebook messages between Mr. Roberts and Mr. Slater regarding his medical condition and where he was at. And again, to look at this as totality of circumstances, two and a half months, three months, he works four days as a result of hospitalization. To pretend like they don't know what's going on is absolutely a disputed issue of fact. And when they claim that they did their interactive process because they reached out to him two times, Scott Hughes didn't say, you may find it recorded. He said that's what they do. When they call, they make that note. It's in there when they make that call. There was no evidence that they made the calls, not to mention the fact they were calling a house that nobody was at because he's in the hospital. And on top of all that, they're supposed to use formal and informal means. He communicated, Mr. Slater communicated with Mr. Roberts over 50 times in the last two and a half months. There's nothing preventing him from picking up the phone and sending another Facebook message or picking up the phone and looking at the ones he's already received. For the appellants to argue that they engaged in the interactive process or suggest that is absolutely just not supported by the facts. And the final point, Your Honor, there is no case law out there that suggests once you're you're required to go grovel at your employer and beg for your job back. He was terminated. He said, I'll clear out my office. And he declined an opportunity to talk to the supervisor who knew he was in the office. And my time is also up. So if there are no further questions. Thank you. Thank you, Mr. Walters. The case has been submitted. We appreciate counsel's argument in pre-COVID times, we would come down and greet you personally. Obviously, we can't do that here in the future. But know that we very much appreciate your arguments and your being here today. So with that, the court stands adjourned until tomorrow morning. Thank you very much.
judges: Albert Diaz, Allison J. Rushing, Toby J. Heytens